PUERTO RICO LABOR RELATIONS BOARD, Petitioner, *v.* INTERNATIONAL LONGSHOREMEN ASSOCIATION (ILA), DISTRICT COUNCIL OF THE PORTS OF PORTO RICO ET AL., Respondents.

No. 36. Argued June 9, 1952.—Decided July 23, 1952.

---

*Víctor Gutiérrez Franqui,* Attorney General, *Aurelio Torres Braschi,* Assistant Attorney General, *Hiram R. Cancio Vilella* and *Ramón Acevedo Oliveras,* the latter for the Board and all for petitioner. *Hipólito Marcano* and *Juan Marcano* for respondents. *José López Baralt,* counsel for the Central Roig Refining Co., and *Charles R. Hartzell, Rafael O. Fernández* and *José L. Novas* for the P. R. Steamship Association, as *amici curiae.*

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

This case provokes thoughts which reach far beyond the limits of the controversy before us: the noble virtues of democracy, which have made it great, and the weaknesses and intolerance of those who enjoy it, which may jeopardize it.

In the inevitable disagreements that arise between capital and labor, each occasionally seems to forget, in the exercise of their respective rights—which exist as long as the democratic heritage and the integrity of the state that

recognizes them are preserved—the moral and patriotic duty to find prompt solutions for their controversies, in order that the economy and the security of the system which gives life to these rights may not be affected and that internal or external forces may not take advantage of the processes of democracy to undermine its foundations and to attempt to cause its self-destruction.

This case reflects—in the arid confines of litigation—one more example of the legitimate effort of the people struggling against scarcity and poverty, caused by the imbalance between its continued growth in population and its meager resources, in their desperate fervor to improve their conditions of health and their standards of living through the maximum development of their limited economic potentialities, for which an indispensable factor is industrial peace in all the phases of productive activities, with the greatest expression of such stability—in view of its position as an Island—at the waterfront.

Directing its dynamic effort to obtain vital realities for our people in the field of industrial peace, as it has done in other fields, the Legislative Assembly of Puerto Rico, while the National Labor Relations Act—The Wagner Act, 49 Stat. 449, 29 U.S.C.A. § 151 *et seq.*—was in effect, enacted on May 8, 1945, the Labor Relations Act of Puerto Rico— Act No. 130 (Sess. Laws, p. 406)—which it subsequently amended by Act No. 6 of March 7, 1946, (Sess. Laws, p. 18). When establishing in the declaration of principles of the said Act the public policy of the Government of Puerto Rico as to relations between employers and employees and collective bargaining agreements, it declared as follows:

"(1) It is a fundamental necessity of the people of Puerto Rico to develop its production to the maximum in order to establish the highest possible living standards for the ever growing population; it is the obligation of the Government of Puerto Rico to adopt such measures as may be conducive to the maximum development of this production and remove the threat

that a day might come when, with the continuous increase in the population and the impossibility of maintaining an equivalent increase in production, the people must confront, a hopeless catastrophe; and it is the aim of the Government to develop and maintain such production through the comprehension and education of all the elements composing the people as regards the fundamental necessity of raising production to the limit and of distributing this production as equitably as may be possible; and it is likewise the purpose of the Government to develop in practice the principle of collective bargaining, in such a manner that the basic problem of the necessity for maximum production can be solved.

"(2) Industrial peace, adequate and regular salaries for the employees, and uninterrupted production of goods and services by means of collective bargaining, are essential factors for the economic development of Puerto Rico. The achievement of these objectives depends to a large extent upon fair, friendly and mutually satisfactory relations between employers and employees, and upon the availability of adequate means for the peaceful solution of employer-employee controversies.

"(3) By means of collective bargaining, terms and conditions of employment are to be established. For the purposes of such bargaining employers and employees shall have the right of forming organizations of their own choosing.

"(4) It is the policy of the Government to eliminate the causes of certain labor disputes, by developing the practices and proceedings of collective bargaining and by establishing an* adequate, efficient, and impartial tribunal which will carry out this policy.

"(5) All existing collective bargaining contracts, as well as those hereafter executed, are hereby declared to be instruments for the promotion of the public policy of the Government of Puerto Rico in its efforts to develop production to the maximum; and it is declared that as such they are vested with a public interest. The exercise of the rights and the performance of the obligations by the parties to such collective bargaining contracts are therefore subject to such reasonable regulations as may be necessary to effectuate the public policies of this Act."

---

*In the Act it is incorrectly printed "and."

Sections 8(1) (f), concerning employers, and 8(2) (a), concerning labor organizations, declared an unfair labor practice for an employer or a labor organization, acting individually or in concert with others to "Violate the terms of a collective bargaining agreement, including an agreement to accept an arbitration award, whether the same is or is not included in a collective bargaining contract; . . ."

It is because they engaged in the unfair practice of breach of agreement—§ 8(2) (a) of the Act—upon violating the no-strike clause included in the collective bargaining agreement to which we shall refer shortly hereafter, that the Puerto Rico Labor Relations Board, to which we shall hereinafter refer as the Insular Board, issued on April 14, 1952, after due procedure, an Order to the respondents to "cease and desist from violating in any form the terms of the agreement they have signed, or they may sign" with the Puerto Rico Steamship Association and the steamship companies, represented by the latter, "or with any other association or employer," and to take some positive action. This is the Order that the Insular Board in conformity with the provisions of § 9(2) (a) of the Act, is asking us to put into effect.

A brief statement of facts is necessary for the proper understanding of the problem we now confront.

On October 24, 1950 the Local Unions affiliated to the International Longshoremen's Association and the Free Federation of Labor of Puerto Rico, represented by the International Longshoremen's Association, District Council of the Ports of Puerto Rico, signed a collective bargaining agreement [1] —retroactive to the 1st of January, 1950 and

---

[1] On October 24, 1950 the International Longshoremen's Association was integrated by two branches: one, "District Council of Puerto Rico," and the other "District Council No. 2." Each branch signed a separate collective bargaining agreement with those companies members of the Puerto Rico Steamship Association that were employing workmen affiliated to each branch. On November 12, 1950 both councils merged and ever since they became integrated in a single organization denominated Inter-

for the term of two years—with the Puerto Rico Steamship Association, the latter representing the steamship companies of Puerto Rico, establishing the terms and working conditions in the various ports of the Island, the work shifts and the wages to be paid to the laborers and employees in the various working classifications related with the loading and unloading of vessels aboard or ashore, and with delivery of cargo stored in the docks.[2]

The clause for duration of such agreement provided the following:

"The contracting parties agree that this collective bargaining agreement will be retroactive to the 1st of January 1950 and it will continue in force during a period of two (2) years from said date, that is, up to and until the 31st of December 1951. Providing, however, that any one of the parties, with not less than sixty (60) days notice prior to the 31st of December, 1950 could notify the other party in writing, his wishes to amend exclusively the wage scale provided in this agreement by Article III.

"Further providing, that in case of any amendment to the law establishing a working period of less than 8 hours per day or 40 hours per week, the parties will meet in order to negotiate the working hours and scale of wages plus clauses that may be affected by such an amendment."

And the no-strike clause, Article VII, Par. 27 (par. 26 of the English version) as follows:

"27. All and each of the members of the Union included in the bargaining unit obliges not to stop work totally or partially

national Longshoremen's Association, District Council of the Ports of Puerto Rico, affiliated to the ILA and the Free Federation of Labor of Puerto Rico. By stipulation signed on March 12, 1951 the Puerto Rico Steamship Association representing the steamship companies recognized the new organization as the only exclusive contracting unit. For that reason, we shall make reference in the course of this opinion, to one single collective bargaining agreement.

[2] The dock clerks employed by some of the steamship companies for the delivery of cargo stored in the Port of San Juan are not covered by this agreement, being affiliated with another labor organization known as (Unión de Empleados de Muelles de Puerto Rico) UDEM, which is the contracting unit for such type of work in said cases.

for any reason or motive during the life of this agreement and in case of any incident, dispute or controversy which may develop with reference to the interpretation of any clause of provision of this agreement, the workers shall continue the work and said incident, dispute or controversy shall be immediately discussed by the representatives authorized or delegate of the Union directly with the Manager or authorized representative of the Company and not with the foremen, and if no agreement is reached the matter in discussion shall be submitted to the Arbitration Committee established in Article IX of this agreement."

On October 30, 1950 the contracting Union addressed a letter to the Association representing the steamship companies "expressing its wish to reopen the wage clause in accordance with the agreement." The Association answered the Union that "having signed the agreement so very recently, no change of any kind had taken place to justify amendments to the scale of wages but that the companies were very well disposed and ready to sit down to negotiate at any time the Union may choose." [3]

Between October 22 and December 6, 1951 certain facts developed which are summarized as follows: [4]

"1. On October 24, 1951 a collective bargaining agreement was in existence and in force between the Association and ILA.

"2. This agreement included a clause in which ILA agreed not to go into strike for any reason or motive during the life of the agreement.

"3. On October 24, 1951 members of the Press and Radio Union drew picket lines in front of the docks in San Juan.

"4. The workers members of ILA, engaged in loading and unloading the ships in the docks, refused to cross the picket lines.

"5. The Companies took all the necessary steps to induce the laborers to return to work.

"6. Officials of ILA made a condition for return to work, that merchandise belonging to sponsors of the Radio Station

---

[3] From Mr. Ramón Rodríguez Sánchez' testimony before the Insular Board, page 71.

W.K.A.Q. programs should not be handled and that the ships should be shifted to docks where personnel affiliated to U.D.E.M. would not be employed.

"7. On October 29, 1951 authorized by the President of ILA, Mr. Eusebio G. Moreno, work of loading and unloading in the waterfront was resumed.

"8. The collective bargaining agreement included a clause permitting the reopening of wage negotiations.

"9. It included also a clause compelling ILA to notify the steamship companies 48 hours in advance the holding of assemblies.

"10. On October 24, 1951 the contracting parties met in order to discuss wages.

"11. An impasse developed because the companies wished that ILA would guarantee fulfilment of the agreement then in effect.

"12. ILA notified the companies that on November 29, 30 and December 3 of 1951 the workers would hold assemblies in Mayagüez, Ponce and San Juan respectively.

"13. In Ponce and San Juan the workers decided to remain in permanent assembly until a decision would be reached in connection with wages.

"14. Members of ILA in Ponce worked in the loading and unloading of two ships, one in Guayanilla and the other in Ponce, during November 30 and December 6, 1951.

15. On December 5, 1951 the parties signed a stipulation compelling the companies to guarantee an increase of not less than 3¢ per hour and that negotiations would be resumed as soon as possible and ILA to return to work.

"16. Therefore, on December 6, 1951, at 7:00 a. m. in San Juan and at 2:00 p. m. in Ponce the loading and unloading operations of ships was resumed."

On October 29, 1951 the Association filed charges before the Insular Board against ILA—District Council of the Ports of Puerto Rico and its President Eusebio G. Moreno, claiming unfair labor practices under § 8(2) (a) of the Labor Relations Act of Puerto Rico, consisting in that on October 22,

---

⁴ From the trial Examiner's Report, accepted by the Board, pp. 15, 16 and 17.

1951 and up to the date charges were filed, "they have been violating Pars. 27 and 28 [pars. 26 and 27 of the English version] of Article VII of the collective bargaining agreement in force between said labor organization and the steamship companies members of the Puerto Rico Steamship Association when they declared a state of illegal strike, developing such a strike into the stoppage of loading and unloading operations and delivery of merchandise from the ships belonging or consigned to the steamship companies members of the Puerto Rico Steamship Association."

On December 14, 1951 second charges were filed against the same International Longshoremen's Association (ILA), District Council of the Ports of Puerto Rico and its President, Eusebio G. Moreno, as well as against its affiliated Unions, claiming unfair labor practices under the same article, Section and item of the Act above mentioned, consisting that "in or about November 30, 1951 and up to the present date" they violated par. 27 [26] of article VII of the collective bargaining agreement in force "when they declared a state of illegal strike in the port of Ponce, Puerto Rico, developing such a strike into the stoppage of loading and unloading and delivery of merchandise from the ships owned by or consigned to the petitioner steamship companies." It was also alleged in those charges identical unfair practice from December 3, 1951, "when it was declared that the strike in the port of San Juan was illegal," with equal consequences.

In view of the charges of reference, which were consolidated for all purposes, the Insular Board filed a complaint against ILA as it has been named before and its President Moreno, and its affiliated: Local Union No. 1782 and its President, Ramón Mejías; Local Union No. 1740 and its President, Amado Torres Báez; Local No. 1764 (Dock Clerks' Union) and its President, Juan Vidal Alvarez and its Sub-Local Union of Dock Clerks No. 1674 and its Presi-

dent, Lorenzo Rosaly, charging them, as unfair labor practice under § 9 (2) (a), the violation of collective bargaining agreement in its no-strike clause.

A Trial Examiner having been appointed, a date for hearing was set as provided in § 9 (1) (a) of the Act, notifying all the parties concerned. Attending such a hearing were the Insular Board represented by its attorney as well as the companies represented by theirs, but not the respondents, who did not appear. After evidence to support the complaint was introduced, the Trial Examiner submitted his report to the Insular Board [5] on February 13, 1952 and the latter, on April 14 rendered decision, adopting his conclusions and recommendations, issuing the Order against the respondents which we are now asked to put into effect.

In answer to the petition the respondents attack the jurisdiction of the Insular Board to intervene in the proceedings wherein the mentioned Order was issued, contending that such jurisdiction resides exclusively in the National Labor Relations Board in view of the fact that "the supposed actions on the part of the respondents constitute unfair labor practice or refusals to negotiate on the part of the respondent unions, all of which is specifically provided by the Taft-Hartley Act," and that the National Board is already intervening "in the facts motivating the present proceeding in the Labor Relations Board of Puerto Rico." They also allege that the remedy of the petitioner is not to appeal to the Insular Board, but to file a damage suit in accordance with § 301 of the Taft-Hartley Act, inasmuch as the Insular Board "can not consider as unfair labor practice [breach of agreement] an action specifically excluded as such" by the Federal

---

[5] The first appearance of the respondents before the Insular Labor Relations Board, as shown in the record before us, took place on February 21, 1952, eight days after the Trial Examiner had made his report, for the purpose of asking extension of time in order to present objections to the Trial Examiner's report. From the record there is no evidence that same were ever filed.

Act, in view of the substitution made for such a remedy; that there was no violation of agreement when they remained in permanent assembly, inasmuch as such assemblies were called strictly in accordance with par. 29 (par. 28 in the English version) of Article VII of said [6] agreement; that if the Insular Board's Order is sustained the respondents would be subject to double jeopardy for the same Acts, in two different jurisdictions, the Insular and the Federal, and that, at any rate, such an agreement expired on December 31, 1951 and a new agreement was signed on March 13, 1952, which is now in force. In his oral argument on the day of the hearing the attorney for the respondents alleged that the collective bargaining agreement included a clause on closed shop in violation of the Federal Law, and therefore, the National Board had already filed a complaint against the Union and the Companies; that the Order of the National Board would have the effect of voiding not only the illegal clause but the entire agreement, and for that reason the Insular Board, could not, nor this Court, put into effect an Order to cease and desist from violating an agreement that never existed.

We shall now turn to consider the matters alleged.

### The Matter of Jurisdiction

The objective of the National Labor Relations Act, amended by the Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 136, 29 U.S.C.A. § 141, is to promote industrial peace, fostering the adoption of collective bargaining agreements, by collective bargaining, to govern the relations between unions and employers. *N.L.R.B.* v.

---

[6] This paragraph provides:

"29 [28].—When the Union is to hold a meeting, it shall notify the Companies not less than 48 hours in advance.

"If for the convenience of the work it is necessary to postpone by mutual agreement the holding of a meeting, the Union shall extend the 48 hours time without being compelled to grant additional extension."

*American National Insurance Co.*, 343 U.S. 395, —L. ed.— (1952) ; *Consolidated Edison Co.* v. *National L. R. Bd.* (1938), 305 U. S. 197, 83 L. ed. 126. Said Act does not compel the Unions or the employers to accept the proposals of the other party, nor does it require the making of concessions. Section 8(*d*). Neither does it regulate the rates of hours, of wages and working conditions to be incorporated into an agreement. The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively. For this reason, enforcement of the obligation to bargain collectively, is crucial to the statutory scheme. *N.L.R.B.* v. *American National Insurance Co., supra.*

The national interest expressed through the National Labor Relations Act is not primarily centralized in working conditions as such. As far as the Act is concerned, such conditions could be "as bad as the employees will tolerate, or be made as good as they can bargain for." *Terminal R. R. Asso.* v. *Brotherhood of R. R. Trainmen* (1943), 318 U. S. 1, 87 L. ed. 571.

Congress, pursuing the objective of promoting the industrial peace, placed unions and employers on the same level for the purposes of collective bargaining. And without undermining the fundamental right to strike, it regulated —as far as it considered adequate to maintain the balance of power between capital and labor for the purpose pursued—the conduct of the unions as well as of the employers, declaring as unfair labor practices certain activities of one or the other. To restrain and prevent the unfair labor practices specified in § 8 of the Act, it gave power to the National Labor Relations Board, which power "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreements,

law or otherwise." Section 10(a).[7] In the exercise of such a power the jurisdiction of the National Board is exclusive. *Asoc. Empl. Bayamón Transit* v. *Labor Relations Board*, 70 P.R.R. 273, and cases and authorities cited therein. In that case, studying the reach of § 10(a) of the Taft-Hartley Act, we said: "This provision has been almost uniformly construed to mean that where an employer is subject to the Taft-Hartley Act, the jurisdiction of the National Board as to unfair labor practices covered by the Federal Act is exclusive, and that a State or Territorial Board may obtain jurisdiction thereof *only if the National Board cedes jurisdiction pursuant to § 10(a)* (Citations)." See also, in addition to the authorities cited in said case, the following: Feldblum, Jurisdictional "Tidelands" in Labor Relations (February, 1952), 3 Labor Law Journal 114; Forkosch, N.L.R.B's New Jurisdictional Rule on Secondary Boycotts (April, 1951), 2 Labor Law Journal 247; Garfinkel, The Conflict between Federal and State Jurisdiction (Oct., 1950), 1 Labor Law Journal 1027; Petro, State Labor Law, 1950 Annual Survey of American Law 367; Benetar, Jurisdictional Conflict in Labor Law; *State Boards* v. *The National Board* (January, 1950), 36 American Bar Association Journal 27; Schwartz, No Mansland in Labor Relations (December, 1949) 1 Labor Law Journal 189; Feinsinger, Federal-State Relations Under the Taft-Hartley Act, 1948 Proceedings, New York University First Annual Conference on Labor, 463.

[7] The complete text of this § 10(a) is the following:

"The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in § 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided,* That the Board is empowered by agreement with any agency or any State or Territory to cede to such agency jurisdiction over any cases in any industry (Other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act or has received a construction inconsistent therewith."

Deciding the question of jurisdiction, that did not involve a violation of agreement under the Insular Law, we said in the Bayamón Transit case that the Insular Board "has jurisdiction only where (1) the employer commits an unfair labor practice or engages in some other conduct not listed in the Federal Act but included in the local Act," "(2) the business of the employer is exempt under the Federal Act but is subject to the Insular Act, i. e., agriculture and government corporations"; and "(3) the National Board cedes jurisdiction to the Insular Board pursuant to the conditions laid down in Section 10 (a) of the Taft-Hartley Act." As in the present case numbers (2) and (3) were not included, the question of jurisdiction primarily centers on the fact of whether the strike of October 1951, being an unfair labor practice under the Taft-Hartley Act—and at the same time a violation of the no-strike clause—the Insular Board has jurisdiction under the local Act, which establishes as an unfair labor practice the violation of a collective bargaining agreement.

As the exclusive jurisdiction of the National Board is, under the terms of § 10 (a), limited to the scope of unfair labor practices provided in § 8, the jurisdictional conflict that could arise from laws or actions of state or territorial boards, in the field of labor management relations, will depend on the field that Congress may have covered in the exercise of its power under the Commerce Clause—and that of Territories, in its case—inasmuch as the Federal Act "has closed to state regulation the field of peaceful strikes in industries affecting commerce." *Amalgamated Asso.* v. *Wisconsin Empl. Rel. Bd.,* 340 U. S. 383, 394, 95 L. Ed. 364, 375; *International Union* v. *O'Brien,* 339 U. S. 454, 94 L. ed. 978.

A brief reference to the decisions of the National Supreme Court, involving the important and yet controversial question relative to the jurisdiction of State Board in labor

management relations, is necessary for the better understanding of the problem we are concerned with.

Up to the present date, the Supreme Court has decided nine cases in which this question has been considered. In three of them the action of state or its regulation has been sustained. In six of them it has been reversed. In *Allen-Bradley Local* v. *Board* (1942), 315 U. S. 740, 86 L. ed. 1154, the jurisdiction of the Labor Relations Board of Wisconsin was sustained upon the enforcing of an order against the union which it found guilty of unfair labor practice under the state law. The activities of the union which gave rise to such an order were, briefly, that the employees engaged in mass picketing at all entrances to the premises of the company, obstructing and interfering with the entrance to and egress from the factory; that they threatened bodily injury to many employees who desired to continue their employment; that the union, by its officers and a number of its members, injured the persons and property of the other employees and that a number of members of the appellant union carried out acts consisting of intimidating employees and preventing them from performing their work by threats, coercion and assault.

In affirming the decision of the Supreme Court of Wisconsin, the Supreme Court held that the Federal Act—Wagner Act—did not prevent the states from approving legislation limited to forbidding or regulating such kind of union activity or of the employees, since their conduct in said case did not fall under the concept of *concerted activity protected* by the Federal Act, the State being entitled to regulate it; that their right to regulate matters traditionally local such as public order and safety, had not been impaired since the intention of Congress to exclude States from exercising their police power must be clearly manifested, and that said intention was not manifested when the State and the Federal Act could be reconciled and consistently stand together.

584

In *International Union* v. *Wisconsin Empl. Rel. Bd.* (1949), 339 U. S. 245, 93 L. ed. 651, the practice of the union was to instigate intermittent and unannounced work stoppages for the purpose of putting pressure upon the employer having extended the same for over a period of more than four months. Upon affirming the judgment of the Supreme Court of Wisconsin which upheld the State Board in its order addressed to the union for it to cease and desist from said conduct, the Supreme Court with a bare majority of 5 to 4, held that the conduct of the union was not forbidden by the Taft-Hartley Act and that no proceeding was authorized by which the Federal Board may deal with it in any manner; that while it was empowered "to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because its method is illegal—even if the illegality were to consist of actual or threatened violence to persons or destruction of property. Policing of such conduct is left wholly to the states," in the exercise of their police power. "This conduct," the court stated "is governable by the State or it is entirely ungoverned."

In *Algoma Plywood Co.* v. *Wis. Board* (1949), 336 U. S. 301, 93 L. ed. 691, the Supreme Court of Wisconsin and the State Board were equally upheld in their order directed to an employer to cease and desist from giving effect to a maintenance-of-membership clause; to offer reinstatement to an employee discharged for refusal to pay union dues; and to make him whole for any loss of pay. At every stage of the proceedings the employer as well as the union contested the jurisdiction of the State Board on the ground of the exclusive authority of the National Labor Relations Board, that there was conflict between the State Act and the Federal Act since the former declared as an unfair labor practice to include in an agreement a maintenance-of-membership clause unless approved by the vote of ⅔ of the employees, while the latter

allowed said clauses if approved only by a majority. The Supreme Court held that the Federal Act left the States free to pursue their own more restrictive policies in the matter of union-security agreements.

Establishing the scope of § 10 (a) of the Taft-Hartley Act in connection with the cession of jurisdiction on the part of the National Board to the State Boards, the Supreme Court stated that this cession of jurisdiction is to take place only where State and Federal laws have parallel provisions; where the State and Federal laws do not overlap, no cession is necessary because the State's jurisdiction is unimpaired.

On the other hand, in the six remaining cases the action of the State legislation was declared invalid. In *Hill* v. *Florida* (1945), 325 U. S. 538, 89 L. ed. 1782, a State statute requiring a license for business agents of labor unions, prescribing their qualifications and making the issuance of the license depend on a determination by State officers that they possess such qualifications, was declared invalid. As ground for such judgment it was stated that the statute interfered with the full freedom which employees are given under the National Labor Relations Board to choose their own collective bargaining representatives, since § 7 of said Act recognized said right in an illimited manner, and being protected by it, the State could not impose a limitation thereof even when the State and the Federal Act could consistently stand together.

In *Bethlehem Steel Co.* v. *New York Labor Rel. Bd.* (1947), 330 U. S. 767, 91 L. ed. 1234, the National Board refused to recognize a foremen's union as an appropriate unit for collective bargaining. Then the Labor Relations Board of New York certified said union as such. On appeal to the Supreme Court of the United States it held that the refusal of the National Board to recognize foremen's unions as appropriate units for collective bargaining under the National Labor Relations Board did not leave state author-

ities administering a state labor law free to do so; that when the National Labor Relations Board "leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters federal policy is indifferent, and since it is indifferent to what the individual of his own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state"; and that the Federal and State Acts concerning union representation as appropriate units for collective bargaining have laid hold of the same relationship and involved the same persons but governed by somewhat different standards; that if the application of the state law would be permitted, two agencies would be exercising jurisdiction on the same matter and in the probability of such administrative conflict, the National Act was supreme.

In *La Crosse Tel. Corp.* v. *Wis. Board* (1949), 336 U. S. 18, 93 L. ed., 463, the Wisconsin Employment Relations Board ordered, at the request of a union in rivalry with the union with which an employer had theretofore entered into a collective bargaining agreement to continue from year to year unless terminated by a specified notice, that an election be held. As a result of said election, it certified the rival union as collective bargaining representative. Both the employer and the ousted union brought an action in the state court to challenge the State Board jurisdiction. On appeal, the Supreme Court of the United States ultimately held that the State Board may not exercise jurisdiction to determine the appropriate bargaining representative or union of representation of employees of an employer engaged in interstate commerce although the National Board has not assumed jurisdiction in the matter, where the latter has not exercised its statutory power to cede its jurisdiction to a state agency.

In *Plankinton Packing Co.* v. *Wisconsin Emp. Rel. Bd.* (1950), 338 U. S. 953, 94 L. ed. 588, the Supreme Court

relying on the *Bethlehem* and *La Crosse* cases, reversed, in a per curiam decision, a judgment of the Supreme Court of Wisconsin by which said court held that the conduct of a union whose members coerced and intimidated an employee to cause his loss of employment for the reason he had exercised his right to refrain from membership in the respondent union—inducing the employer to discharge him from his employment—which he did, constituted an unfair labor practice of the union as well as of the employer, under the laws of Wisconsin.

In *International Union* v. *O'Brien* (1950), *supra,* employees went on a strike to enforce demands for higher wages without conforming to the prescribed procedures of the State of Michigan which required a strike vote with a majority in order to authorize a strike, after the parties were unable to settle the dispute by mediation. The Supreme Court of the United States held that Congress occupied the field of regulation of peaceful strikes for higher wages and closed it to concurrent state regulation by the National Labor Relations Board, as amended by the Taft-Hartley Labor Act, which in its § 8(d) regulates the matter without requiring majority authorization for any strike. The Court held that the Michigan provision of the State law conflicted with the exercise of federally protected labor rights and therefore it could not survive. In said case *International Union* v. *Wisconsin Empl. Rel. Bd., supra,* was distinguished, reaffirming the principle that if Congress has protected the union conduct which the state has forbidden, the state legislation must yield.

And in *Amalgamated Asso.* v. *Wisconsin Empl. Rel. Bd., supra,* a statute of Wisconsin which made it unlawful to go on strikes against any public utility service and which provided for compulsory arbitration in collective bargaining whenever an impasse was reached in the bargaining process, was declared void because it conflicted with the National

Labor Relations Board as amended by the Taft-Hartley Act. Citing the case of O'Brien and after examining § 7 of the National Act and stating how it safeguarded for employees their right to strike as well as other provisions of said Act which regulate and forbid strikes under several situations it stated: "In any event, congressional imposition of certain restrictions on petitioners' right to strike, far from supporting the Wisconsin Act, shows that Congress has closed to state regulation the field of peaceful strikes in industries affecting commerce. [O'Brien case is cited.] And where, as here, the state seeks to deny entirely a federally guaranteed right which Congress itself restricted only to a limited extent in case of national emergencies, however serious, it is manifest that the state legislation is in conflict with federal law."

From the previous summary it is obvious that none of the actions of the State Board in the cited cases was predicated in a violation of a collective bargaining agreement as an unfair labor practice under the State law.[8]

The Federal Act does not establish, in its § 8, as an unfair labor practice the violation of a collective bargaining agreement. *Labor Relations Board* v. *N. Y. & P. R. S/S. Co.*, 69 P.R.R. 730. Such field is not occupied by said Act in such a way as to exclude state or territorial regulation in that sense, *W.E.R.B.* v. *Bookbinders & Bindery Women's Local No. 49*, 21 Labor Cases 66, 484; *cf.* Federalism and Labor Relations (1950), 64 Harv. L. Rev. 211, in the exercise of its police power. The declaration of principles

---

[8] Wisconsin Employment Peace Act establishes, by its § § 111.06 (1) (*f*) and 111.06 (2) (*c*), the violation of a collective bargaining agreement as an unfair labor practice.

The Labor Relations Board of Minnesota establishes by its § 179.11 that a strike in violation of an agreement, when the employer is complying with it in good faith, is an unfair labor practice, and likewise the violation of the terms and conditions of a collective bargaining; and by § 179.12 the same declaration is made concerning employers and the "lockout" as well as the violation of the terms and condition of a collective agreement.

of the local Act establishes the contemporary reality on which the Legislative Assembly based its regulation as to the violation of collective agreements. It is the increasing menace to the safety, life, and health of a people in their effort to avoid disaster, which moved the legislative power to declare collective agreements as instruments to promote the public policy of the Government of Puerto Rico, and as such vested with public interest.

 The Federal Act did not confer upon the National Board any power whatsoever to prevent the violation of a collective bargaining agreement nor to prevent a strike in violation of a no-strike clause in an agreement merely because of said violation, even though it has been invested with the power, independent of the agreement, to prevent a strike when the conduct in question may constitute an unfair labor practice under § 8. The reason is that the philosophy of the Federal statute is essentially based on the need of encouraging collective bargaining and the adoption of voluntary agreements. And even though the duty to bargain collectively does not end with the signing of an agreement, *N.L.R.B.* v. *Jacobs Mfg. Co.* (C. A. 2, 1952)—F. 2d—, the main interest of the statute has been complied with said signature. From there on, as to the modification or termination of an agreement, a strike is only forbidden for a limited period. Section 8(d). Once the requirements have been complied with, there is nothing in the law to forbid it. But when it has been waived by a no-strike clause, a strike called in violation of said clause is illegal, for it does not fall within the "concerted activities" protected by § 7 of the Federal Act. *National Labor Rel. Bd.* v. *Sands Mfg. Co.*, 306 U. S. 332, 83 L. ed. 682, nor is it protected by § 13 which establishes the scope of the Act as to the right to go on strike. "But this recognition of 'the right to strike' plainly contemplates a lawful strike,—the exercise of the unquestioned right to quit work, *National Labor Relations*

*Bd.* v. *Fansteel Metalurgical Corp.*, 306 U. S. 240, 83 L. ed. 627—and it did not operate to legalize . . . a strike . . . in violation of a contract made pursuant thereto." *International Union* v. *Wisconsin Empl. Rel. Bd., supra.*

There is no doubt, for what is said in the case of O'Brien, citing *Plankinton, La Crosse, Bethlehem* and *Hill* v. *Florida, supra*, and repeated in *Amalgamated Asso.*, that § § 8 (*d*) and 8 (*b*) (4)[9] —and § § 10 (*j*) and 10 (*l*) of the Taft-Hartley Act which authorize and order the National Board to seek injunctive relief against the strikes forbidden by the mentioned Sections—do not permit "concurrent state regulation of peaceful strikes for higher wages" and that Congress "occupied this field and closed it to the state regulation."

But the question involved in this case does not hinge on any regulation on the part of the Insular Legislature or Board of a strike as such. The Order of the Insular Board does not forbid a "strike" which as such is protected by § § 7 and 13 of the Act, or is forbidden by § § 8 (*d*) or 8 (*b*) (4), considering that a strike in violation of a collective bargaining agreement is not protected by § 7 or § 13 nor forbidden by § § 8 (*d*) *or* 8 (*b*) (4). The Order prohibits *the violation* of a collective bargaining *agreement* accepted by the Union, which contains a no-strike clause, that was violated by the Union. At most, it could be said that the Order of the Insular Board prohibits a strike which not being protected nor prohibited by the Taft-Hartley Act, is forbidden by the very will and determination of the Union,

---

[9] Section 8 (*d*) prohibits to go on strike during a period of 60 days after giving notice of the intention to modify or terminate a collective bargaining agreement, when there is one in force, and fixes certain prerequisites to be complied with. The violation of this Section constitutes a *refusal to bargain* and as such, is an unfair labor practice. *Curry* v. *Unión de Trabajadores de la Industria del Cemento Ponce* (D. C.. P. R., 1949), 86 F. Supp. 707.

It is § 8 (*b*) (4) which prohibits to go on strike for certain purposes among them, to produce a so-called secondary boycott.

when it bound itself not to resort to strike during the existence of the agreement, which is an unfair labor practice under the Insular Act.

A strike in violation of a no-strike clause in a collective bargaining agreement, is a material breach of the contract, but not an abandonment or total repudiation of the agreement, which offers the employer the opportunity to terminate it at his choice. *Boeing Airplane Co.* v. *Aeronautical Industrial Lodge, etc.* (C. A. 9, 1951), 188 F. 2d. 356.

■ The term "unfair labor practice" is not a term of art having an independent significance which transcends its statutory definition. The states are free (apart of preemption by Congress) to characterize any wrong by an employer to an employee [or by an employee to an employer] whether statutorily created or known to the common law, as an unfair labor practice. *Algoma Plywood Co.* v. *Wis. Board, supra.* Just as in said case, to accept here the theory of the respondents of lack of jurisdiction of the Insular Board would be to repudiate the phrase "(listed in § 8)" included in § 10 (*a*) of the Taft-Hartley Act, and to add the phrase "and no other agency shall have the power to prevent any unfair labor practice not listed in Section 8."

■ The violation of a no-strike clause in a collective agreement is an unfair labor practice under the local Act, over which the Insular Board may act and apply a remedy notwithstanding that the means to carry out the violation of an agreement constitutes an unfair labor practice under the Federal Act. *Art Steel Co., Inc.* v. *Velázquez* (1952), 109 N.Y.S. 2d 788, 21 Labor cases 66, 728, affirmed on other grounds in 111 N.Y.S. 2d 198 (1952) 21 Labor Cases 66, 842. When the field is not regulated, as is not regulated the violation of contracts under the Federal Act, there is no question whatsoever of jurisdiction of the National Board, whether exclusive or not, simply because said Board does not have jurisdiction to grant any remedy whatsoever to pre-

vent a violation of the contract. Therefore, the jurisdiction of the Insular Board to grant a remedy which the National Board can not grant—that of exacting the compliance of the obligations under the contract— is not affected by § 10 (*a*) of the Federal Act. Undoubtedly, of course, the National Board may prevent a conduct which is intrinsically an unfair labor practice under the Federal Act (*i. e.*, the secondary boycott strike of October 22 to October 29) and which is at the same time a violation of the no-strike clause in the contract. But the remedy that the National Board may grant forbidding such acts which it can regulate under the Federal Act, will not reach beyond the limit of the granted power. And the exercise of said authority does not exclude the power of the Insular Board to forbid that over which the local Act was given power and over which the National Board was granted none under the Federal Act. The Insular Board, in the exercise of its power, does not conflict with the Federal Act, because Congress has not "occupied the field" nor does the regulation, in either jurisdiction, hinge on the same unfair labor practice, as the latter is statutorily defined.

The Insular Board was created as a specialized court to administer the Insular Labor Relations Act. And even when the approval of the Taft-Hartley Act has set aside several provisions of the Insular Act because the field had been occupied by the Federal Act the truth is that Congress left the enforcement of the contractual obligation to "the usual proceedings of the law," and not to the National Board. Congress did not accept the proposition that the violation of a contract be established as an unfair labor practice. See 1 Legislative History of the Labor Management Relations Act (1947) 111. United Packinghouse Workers of America, 25 L.R.R.M. 1556; Old Line Life Insurance Co., 28 L.R.R.M. 1539; *Gen'l Bldg. Contractor's Ass'n* v. *Local Unions, etc.* (Pa., 1952) 87 A. 2d 250; 21 Labor Cases 66, 843.

Where Congress leaves the employer-employee relations in the field of violation of collective agreements free of regulation, it may be implied that in such matters "federal policy is indifferent and since it is indifferent to what the individual of its own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state." *Bethlehem Steel Co.* v. *New York Labor Rel. Bd., supra.*

The broad language used by the Supreme Court in *O'Brien* and *Amalgamated Asso.* in the sense that "Congress has closed to state regulation the field of peaceful strikes in industries affecting commerce" should be read as any broad language used in a decision of a court, in the light of the attendant circumstances. *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 82 L. ed. 235. In both cases the state legislation was in conflict with the federal because it restricted labor rights recognized by the Federal Act. It is significant that in the *O'Brien* case—cited with approval in *Amalgamated Asso.*—the court stated that "None of these sections [8(d) and 8(b)(4)] can be read as permitting concurrent state regulation of peaceful strikes for higher wages. Congress occupied this field and closed it to state regulation." Upon repeating that same language in *Amalgamated Asso.,* followed by the citations from *Plankinton, La Crosse, Bethlehem* and *Hill* v. *Florida,* the court referred, in footnote 12, 340 U. S. 390, 95 L. ed. 373, to the *O'Brien* and *Plankinton* cases as follows: "Our decision in *O'Brien, supra,* followed shortly after our reversal, *per curiam,* in *Plankinton Packing Co., supra,* where the Wisconsin Employment Relations Board had, with the approval of the State Supreme Court, ordered reinstatement of an employee discharged because of his failure to join a union, even though his employment was not covered by a union shop or similar contract. Section 7 of the Labor Management Relations Act not only guarantees the right of self-organization and the right to strike, but also

guarantees to individual employees the 'right to refrain from any or all of such activities,' at least in the absence of a union shop or similar contractual arrangement applicable to the individual. Since the N.L.R.B. was given jurisdiction to enforce the rights of the employees, it was clear that the Federal Act had occupied this field to the exclusion of state regulation. *Plankinton* and *O'Brien* both show that states may not regulate in respect to rights guaranteed by Congress in § 7."

The afore-cited footnote may be considered as indicating that notwithstanding the laxity of the language used in *O'Brien* as well as in *Amalgamated Asso.*, to the effect that Congress has occupied the field of *peaceful strikes* and closed it to state regulation, its scope seems limited to those peaceful strikes which are concerted activities in the exercise of the rights protected by § 7 of the Act. And we have already said, citing the cases of *Sands* and *International Union* v. *Wisconsin Empl. Rel. Bd.*, that a strike in violation of a no-strike clause in a contract is not a concerted activity protected by § 7.

But even if the language in *O'Brien* and *Amalgamated Asso.* did not have the limitation stated, their doctrine does not exclude the authority of the Insular Board under the local Act to forbid the unfair practice of violation of contract—field not regulated by the Federal Act—even though under the latter the facts serving as ground for said violation constitute an unfair labor practice.

The Legislative Assembly of Puerto Rico, in establishing and implementing, by the local Act, its public policy, in the exercise of its police power, regulated a field not occupied by Congress and made clear its objective—vital for our survival as a people—that the parties which voluntarily adopt a collective agreement must honor the same and that if as a result of collective bargaining strikes are voluntarily waived, the violation of that term of the agreement can and, to carry out the purpose of the Act, should be prevented.

Said public policy not only does not conflict with that of Congress, but rather has as a starting point the place where the Federal Act failed to set forth the public policy of Congress regarding violations of contracts.

Respondents' argument that § 301(a)[10] of the Taft-Hartley Act offers an exclusive remedy, does not convince us. The right to be exercised by unions and employers under said Section, *Shirley-Herman Co.* v. *Internat'l Hod Carriers, Etc.*, 182 F. 2d 806; *Schatte* v. *International Alliance, Etc.*, 182 F. 2d 158; *Textile Workers Union of America* v. *Aleo Mfg. Co.*, 94 F. Supp. 626; Levinson, Breach of Contract Under the Taft-Hartley Act, 2 Labor Law Journal (April, 1951) 279, is one for the private benefit of employers and unions, and public interest does not play any part in its application. Said Section, as may be verified from its text, in fact facilitates the litigation in Federal Courts eliminating requirements which, otherwise, would preclude them in certain cases from obtaining adequate recovery for damages.

The violation of a no-strike clause has been known "as the prototype of all conceivable contractual violations." Levinson, *op.* and art. cit. However, the Federal Act does not list a violation of a contract as an unfair labor practice, and therefore, it is not regulated in the sense in which in other areas the Supreme Court of the United States has considered "the field occupied" to the exclusion of state regulations. Although in approving § 301(a) Congress established its policy as to the protection that should be given to the integrity of the collective bargaining adopted pursuant to the Federal Act, 2 Teller, Labor Disputes and Collective Bargaining (1950 Supp.), § 398.162, pp. 174, 175, it is

---

[10] Said Section provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

nonetheless true that said policy is manifested through the private exercise of a right, which is only limited to actions for damages and not to remedy of injunctions to prevent, for example, a strike in violation of an agreement. In any event, the right established by § 301 (a) was given to the contracting parties, and it may not be inferred, neither from its text nor from its legislative history, that it was intended to deprive the states and territories from exercising their power to regulate the disdainful conduct of the parties to that agreement, when such conduct jeopardizes the very life of the community by its harmful effect on the basic structure of its economy, considering all the factors which integrate and affect it.

The situation in Puerto Rico which moved the Legislative Assembly to establish the collective agreements adopted voluntarily by unions and employers in the process of free bargaining as instruments of public interest, has no parallel in the United States of America. And we find nothing in the Federal Act precluding the Insular Board, in order to carry out the purposes of the Local Act, from issuing an order to cease and desist from an unfair labor practice not included and not in conflict with the Federal Act and for whose prevention Congress granted no jurisdiction to the National Board.

What has been set forth heretofore supporting the jurisdiction of the Insular Board to order the respondents to cease and desist from their unfair practice of violation of a contract, was stated having in mind the strike of October 22 to 29, 1951—wherein the no-strike clause of the contract was violated committing at the same time an unfair labor practice under the Federal Act, § 8 (b) (4) regarding the secondary boycott. Said reasoning would be applicable *a fortiori* to the strike constituted by the "permanent assemblies" of November and December of the same year. Respondents' contention that the holding of those permanent

assemblies did not constitute any violation whatsoever of the agreement because they were called pursuant to par. 29 [28] of the contract, that is, notifying the companies 48 hours in advance, does not convince us. Although the notice for said assemblies was served pursuant to the terms of the agreement, the truth is that said assemblies, upon being constituted *permanently* and continuing for several days waiting for an offer of increase in salary, degenerated into a strike, in violation of the no-strike clause. It is unnecessary therefore, to examine herein respondents' contention that if the conduct attributed to them be true, as regards the "permanent assemblies," the same would constitute an unfair labor practice under the Federal Act, because it would constitute a refusal to bargain, §§ 8(b)(3) and 8(d); nor the contention of the Insular Board that it is not a question, insofar as these "permanent assemblies" are concerned, of an unfair labor practice under said Act. The Insular Board acted within its jurisdiction upon issuing its order on April 14, 1951.

### The Closed Shop Clause.

A still more serious question arises in this case with regard to Paragraph A of Article I (Art. II of the English version) of the agreement which is called "Union Shop" but which is merely a typical closed-shop clause.

Said paragraph reads as follows: [11]

[11] Other pertinent provisions of the agreement on said point are as follows:

"B. The Companies shall only employ workers who are in possession of their identification cards as members of the Union corresponding to the month or current quarter, provided that the inspector of the Union who may find a worker without such a notification card shall notify the foreman, who shall be obligated to withdraw the man from the work and substitute him for a member of the Union.

"C. The Union obliges to supply all the workers mentioned in Article I of this agreement that may be requested by the Companies to carry out the shifts (regular and extraordinary) of work established in Article III-B and for the other work mentioned in Article I not subject to shifts, and the Companies are obliged to notify the Union with sufficient time

"It shall be a requisite for employment of all the workers mentioned in Article I of this agreement at present employed by the Companies and those which they may employ in the future be bonafide members of the Union."

The agreement also included under the letter F of that Article 1 (Art. II in the English version), a substitute clause which provides:

"It is hereby established that the Companies and the Union, in the application of the preceding paragraph of this Article shall comply with the statutes applicable to labor relations. Any final determination which may affect the validity of this article shall not annul the contract in any other of its provisions provided that in such case it is agreed that this article or that part of same that may be void shall be substituted by the corresponding article of the previous agreement as it was amended by the stipulation signed by the parties on August 10, 1948 which in its original text provides the following:

" 'Membership in the union shall be a condition of employment on and after the 30th day following the beginning of such employment, provided the employer has no reasonable grounds

---

in advance, which shall not be less than three hours in all the ports as to the number of workers to be supplied for the shift from 7:00 A. M. to 4:00 P. M. and if the work shall continue after 4:00 P. M. and/or 12 M. N., the Companies shall notify the Union on or before 12:00 M. D. and the personnel to continue the operations shall be called at 3:00 P. M. and 4:30 P. M. respectively. Further, it is agreed that the Companies shall announce in the Bulletin Board in the docks the hour in which the work shall commence as well as the arrival of the vessel.

"D. In all the ports of the Island (except in the port of San Juan) the workers to be employed by the Companies shall be prepared by both parties within the term of 30 days from the date in which this agreement is signed. From this list the Companies and the Union shall call the personnel. The parties oblige themselves to strictly comply the rotating shift in the employment of the personnel.

"In case that the list does not contain sufficient men to comply with the agreement contracted herewith by the Union, the Union obliges to obtain the necessary additional personnel.

"E. In case that the Union can not supply all the workers requested by the companies one hour before commencing the work during the corresponding shift, the companies may employ any other workers notifying the Union and the workers so employed shall finish the shift of work for which they were employed provided that this provision is not applicable to the working shift at 7:00 A. M."

for believing, (1) that such membership was not available to the employee on the same terms and conditions generally applicable to other members, and (2) that membership in the union was not denied or terminated for reasons other than the failure of employee to tender the periodic dues and initiation fees uniformly required as a condition for acquiring or retaining membership in the union.'

"This substitute clause shall apply taking in consideration the principle of seniority, provided that for the purpose of seniority, seniors are all the workers that at the time of the signing of this agreement appear as employees of the Companies, and temporary employees those employed after its signing."

At the hearing of this petition it was stated that a proceeding is pending before the National Board on unfair labor practice involving the validity of the closed-shop clause. Under these circumstances, we do not deem it proper to pass on the status of the collective agreement in question, because of the effect that the presence of the aforesaid closed-shop clause may have on it, nor to examine the contention of the Insular Board that at most an order of the National Board in said proceeding would render academic the order that the Insular Board asks us to enforce.

The question before us now was not presented to the Insular Board in the proceeding which gave rise to its aforesaid order, nor did the Board have an opportunity of reaching any conclusions in relation thereto. As said question goes beyond the technical functioning of the Federal Act, suggesting a possible conflict between the public policy of Congress, which proscribed closed shops in collective bargainings, and the public policy of our Legislative Assembly which tends to maintain their integrity once they are adopted; and as the fate of the agreement involved herein depends on the determination of the National Board in the proceeding before it and on the scope of the orders it may issue in the exercise of its power, we do not deem it advisable to put into effect now the Order of the Insular Board.

The case shall be remanded to said Board so that once the action of the National Board to that respect is known, it may adjust its order to the situation of law resulting from said action.